UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-mj-6477-PMH

UNITED STATES OF AMERICA

vs.

STEPHANIE DIANE SMITH,

       Defendant.
_____/

FILED BY_____D.C.
OCT 1 1 2023
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?     NO.

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?     NO.

Respectfully Submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   *David A. Snider*
DAVID A. SNIDER
Assistant United States Attorney
Court ID No. A5502260
500 E. Broward Blvd., Suite 700
Fort Lauderdale, FL 33394
Tel: (954) 660-5696
Fax: (954) 356-7336
Email: david.snider@usdoj.gov

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
| STEPHANIE DIANIE SMITH | ) Case No. |
| | ) 23-mj-6477-PMH |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __03/29/2021 through 11/01/2021__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud. |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Kelly DiPietrantonio, Special Agent, FBI
*Printed name and title*

Sworn to and subscribed before me telephonically this 11th day of October, 2023.

Date: __10/11/2023__

*Judge's signature*

City and state: __Fort Lauderdale, Florida__

Patrick M. Hunt, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Your Affiant, Kelly DiPietrantonio, having been duly sworn, does hereby depose and say:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Miami Division. As such, I am an investigative and law enforcement officer of the United States empowered by law to conduct investigations of, and to make arrests for, certain federal criminal violations including, in part, violations of the wire fraud statute. I have been a Special Agent with the FBI since May 2018 and am currently assigned to a Public Corruption Squad in Miami where I conduct investigations involving bribery, Paycheck Protection Program (PPP) loan fraud, Economic Injury and Disaster Loan (EIDL) fraud, election crimes, and money laundering.

2. Through my training and experience, I became familiar with the types of records, electronic and financial, that these schemes generate, and the methodologies used to perpetrate such schemes. Much of my work involved analyzing these types of records to determine the existence of criminal activity and to develop evidence. I have also received formal and on-the-job training in criminal investigation procedures and criminal law. I have personally conducted numerous physical and other surveillances, including wire and electronic surveillance.

3. The information contained in this affidavit is based on, among other things, my participation in the investigation described herein, consensual witness interviews, my review of relevant documents and electronic communications, information from other law enforcement officers and other individuals, and knowledge gained from my personal training and experience.

4. I make this affidavit in support of a criminal complaint charging STEPHANIE DIANE SMITH (hereinafter, "SMITH") with violations of Title 18, United States Code, Section 1343, that is, wire fraud. Based upon the facts set forth herein, there is probable cause to believe

1

that, on or about March 29, 2021, and continuing through in or around November 1, 2021, in Broward County, in the Southern District of Florida, and elsewhere, SMITH did knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

5. Because I submit this affidavit for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the government's investigation.

## BACKGROUND

### *The Small Business Administration*

6. The United States Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

7. As part of this effort, the SBA enabled and provided loans through banks, credit unions, and other lenders. These loans had government-backed guarantees.

### *The Paycheck Protection Program*

8. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020, designed to provide emergency financial assistance to the millions of Americans who were suffering from the economic effects caused by the COVID-19

pandemic. One source of relief that the CARES Act provided was the Paycheck Protection Program ("PPP"), which authorized forgivable loans to small businesses for job retention and certain other expenses.

9. The SBA promulgated regulations concerning eligibility for a PPP loan. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan, including that the business was in operation on February 15, 2020, and either had employees for whom it paid salaries and payroll taxes or paid independent contractors. Payments to independent contractors are typically reported to the Internal Revenue Service ("IRS") on a "Form 1099-MISC." In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees (including owners). These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.

10. In addition, a business applying for a PPP loan was required to provide documentation showing its payroll expenses. This payroll information was material to the application because, pursuant to statutory requirements and implementing regulations, the amount of the loan that typically could be approved was a function of the applicant's historical payroll costs, consisting of compensation to its employees whose principal place of residence was the United States, subject to certain exclusions.

11. Individuals who operated a business under a "sole proprietorship" business structure were eligible for a PPP loan. To qualify for such a PPP loan, individuals had to report

and document their income and expenses from the sole proprietorship. Sole proprietorships typically report their income and expenses yearly to the IRS on a "Form 1040, Schedule C." As with other PPP loans, this information and supporting documentation was used to calculate the amount of money the individual was entitled to receive under the PPP. The maximum PPP loan amount for a sole proprietor with no employees was $20,833.

12. PPP loan applications were processed by participating lenders and third-party loan processors. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, including by electronic transfer through the Automated Clearing House (ACH) system. While it was the participating lender that issued the PPP loan, the loan was 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

13. After the lender funded the PPP loan to the borrower, the lender submitted disbursement details into the SBA E-Tran system, with servers located in Sterling, VA. The SBA's Denver Finance Center, located in Denver, Colorado, created payment files and authorized payments of the PPP processing fee to the lender through the Financial Management System to the Treasury. The primary server for the Financial Management System was in Sterling, VA. The PPP processing fee varied depending on the amount of the loan. Once created, the payment files were then transmitted via wire to the U.S. Treasury disbursing office in Kansas City, Missouri, which, in turn, sent instructions for payment of funds to the Federal Reserve Bank ACH processing site in East Rutherford, New Jersey.

14. The proceeds of a PPP loan could be used only for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest

payments for the business. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods, automobiles, personal residences, clothing, or jewelry, to pay the borrower's personal federal income taxes, or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

15. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the borrower utilized 60% of the loan in the 24 weeks post-disbursement toward payroll costs and utilized the remaining 40% on qualified expense items (e.g., mortgage, rent, and utilities).

16. Applying for PPP loan forgiveness was a separate process that required additional affirmations that the applicant satisfied the eligibility for PPP loan forgiveness. Whatever portion of the PPP loan was not forgiven was serviced as a loan.

***Investigation of Certain Broward Sheriff's Office Employees Who Received PPP Loans***

17. During the COVID-19 pandemic, federal and state law enforcement agencies, including the FBI, the Board of Governors of the Federal Reserve System, Office of Inspector General ("FRB-OIG"), and the Broward Sheriff's Office ("BSO"), became aware that certain current and former BSO employees, including, but not limited to, sworn law enforcement officers, had received one or more PPP loans while they were employed by BSO.

18. In and around May 2022, the United States Attorney's Office for the Southern District of Florida ("USAO"), in coordination with FRB-OIG, BSO, and FBI, opened a criminal investigation to determine whether any current or former BSO employee had violated federal law in connection with obtaining or attempting to obtain a PPP loan or any other form of pandemic relief authorized under the CARES Act, such as loans and advances made available through the SBA's Economic Injury Disaster Loan (EIDL) program (hereinafter, the "Investigation").

19. SMITH is one such current BSO employee whom the USAO and its law enforcement partners investigated after learning that SMITH had received PPP loans while employed by BSO. SMITH has been employed by BSO since approximately March 1996 and held the title of Deputy Sheriff in BSO's Department of Law Enforcement.

20. More specifically, law enforcement learned from SBA records and other sources described below that SMITH received the following two PPP loans while employed by BSO:

   a. SBA loan number 1892748707 in the amount of $20,833.00, which was disbursed on or about April 1, 2021, from a PPP lender ("Lender 1") to borrower "Stephanie Smith" as a sole proprietor doing business as "Children 1st Basketball Training" (hereinafter, the "Children 1st PPP Loan"); and

   b. SBA loan number 7928598808 in the amount of $10,275.00, which was disbursed on or about May 11, 2021, from a PPP lender ("Lender 2") to borrower "Stephanie Smith" as a sole proprietor doing business as "Agape Smith Vending" (hereinafter, the "Agape PPP Loan").

21. As more particularly described below, pursuant to federal grand jury subpoenas, *ex parte* court orders, consensual interviews, and other investigative sources and methods, the Investigation has obtained evidence establishing probable cause to believe that, in connection with the Children 1st PPP Loan and the Agape PPP Loan, SMITH committed violations of the wire fraud statute. That is, SMITH knowingly devised and participated in a scheme to defraud in which SMITH, among other things: (a) submitted and caused the submission of false and fraudulent PPP loan applications; (b) caused the disbursement of fraudulently obtained PPP loan proceeds to herself by means of wire communication transmitted in interstate commerce; and (c) submitted and caused the submission of false and fraudulent applications for forgiveness of her PPP loans.

## **PROBABLE CAUSE THAT SMITH COMMITTED WIRE FRAUD**

### *SMITH Fraudulently Obtained the Children 1st PPP Loan*

22. Loan records obtained by federal grand jury subpoena show that, on or about March 29, 2021, SMITH caused the submission of a PPP loan application to Lender 1 for "Stephanie Smith" (the business legal name) as a sole proprietor doing business as "Children 1st Basketball Training" (hereinafter, the "Children 1st PPP Application"). The Children 1st PPP Application included SMITH's social security number, home address, cell phone number, and email address. It also listed "STEPHANIE SMITH" as the primary contact, and SMITH's Florida driver's license was submitted therewith.

23. The Children 1st PPP Application claimed that Children 1st Basketball Training (hereinafter, "Children 1st") had a total gross income of $100,000 for the tax year 2019. Based upon this claimed total gross income for the tax year 2019, the Children 1st PPP Application requested a PPP loan in the amount of $20,833.32. The Children 1st PPP Application also claimed that the purpose of the PPP loan was for payroll costs, rent/mortgage interest, utilities, and covered operations expenditures. As explained below, evidence shows that Children 1st in fact had zero gross income for the tax yar 2019.

24. Submitted with the Children 1st PPP Application was an IRS Form 1040 Schedule C, purportedly for the tax year 2019. The name of the proprietor on the Schedule C was "Stephanie D Smith" and the business name was "Children 1st Basketball Training." The Schedule C reflected in line 7 that Children 1st had $100,236 in gross income and reflected in line 31 a net profit of $88,193. As explained below, evidence shows that the Schedule C submitted with the Children 1st PPP Application was fabricated and was not filed with IRS.

25. The Children 1st PPP Application was initialed and signed electronically by SMITH via DocuSign. Specifically, a DocuSign Certificate of Completion for the Children 1st PPP Application showed that "STEPHANIE SMITH," using the email address "smithsd417@aol.com," signed the Children 1st PPP Application on March 29, 2021, at approximately 7:19 p.m.

26. Subpoenaed bank records show that, on April 1, 2021, SMITH received the proceeds of the Children 1st PPP Loan in the amount of $20,833. More specifically, Lender 1 funded the Children 1st PPP loan by depositing the loan proceeds into SMITH's checking account ending in 3536 in her name at Bank 1 via ACH transfer. Based on my training and experience and understanding of the ACH system, and my review of records obtained in the Investigation, the disbursement of the Children 1st PPP loan to SMITH caused the transmission of a wire communication in interstate commerce.

27. Subpoenaed loan records further show that SMITH applied for forgiveness of the Children 1st PPP Loan, and that the principal loan amount and interest was forgiven by the SBA. In particular, a "PPP Loan Forgiveness Application From 3508S Revised January 19, 2021" produced by Lender 1 bears SMITH's electronic signature and is dated July 19, 2021. The forgiveness application claimed that $12,499.80 in loan proceeds was spent on payroll costs, and certified that the borrower (SMITH) had complied with the requirements of the PPP rules. Lender 1's records show that it received the Children 1st PPP Loan's then-outstanding principal balance ($20,833) and interest ($68.49) from the SBA on or about July 29, 2021.

28. As indicated above, the Investigation obtained evidence by *ex parte* court order, federal grand jury subpoenas, and other sources, establishing that the 2019 gross income claimed

8

in the Children 1st PPP Application ($100,000) was materially false, and that the IRS Form 1040 Schedule C submitted therewith was a fictitious document not filed with the IRS. In particular:

a. Pursuant to an *ex parte* Order issued by the United States District Court for the Southern District of Florida under Title 26, United States Code, Section 6103(i)(1), the IRS disclosed to the USAO for purposes of the Investigation certain federal tax returns and tax return information relating to SMITH. This disclosure included a copy of SMITH's IRS From 1040 and Schedule C thereto for the tax year 2019 that was filed with the IRS. This tax return showed that, for the tax year 2019, SMITH reported that Children's 1st had $0.00 in gross income (Schedule C, line 7) and a net loss of -$31,911 (Schedule C, line 31). Furthermore, the version of the Schedule C submitted with the Children's 1st PPP Application was not filed with the IRS, and the IRS had no record of any separate business tax return filed for Children's 1st for the tax years 2019 or 2020.

b. Bank account statements for SMITH's checking account at Bank 1 ending in 3536, which received the proceeds of the Children 1st PPP Loan, do not show any deposits consistent with or otherwise supporting the purported $100,000 in gross income in 2019 that SMITH claimed on the Children 1st PPP Application. Bank account statements for SMITH's savings account at Bank 1 likewise show no deposits consistent with or otherwise supporting such gross income.

c. As part of her employment with BSO, SMITH was required to disclose to BSO any outside employment she had while employed by BSO. SMITH did not disclose to BSO that she had any outside employment relating to Children 1st at any time.

29. Based on my training and experience, and familiarity with PPP loan applications, there is probable cause to believe that SMITH fraudulently obtained the Children 1st PPP loan by, among other things, falsely and fraudulently inflating Children 1st's gross income for the tax year 2019, and submitting a fabricated IRS tax document to support such material misrepresentations.

### *SMITH Fraudulently Obtained the Agape PPP Loan*

30. Loan records obtained by federal grand jury subpoena show that, on or about April 15, 2021, SMITH caused the submission of a PPP loan application to Lender 2 for "Stephanie Smith" (the business legal name) as a sole proprietor doing business as "Agape Smith Vending" (hereinafter, the "Agape PPP Application"). The Agape PPP Application included SMITH's social security number, home address, cell phone number, and email address. It also listed "Stephanie Smith" as the primary contact.

31. The Agape PPP Application claimed that Agape Smith Vending (hereinafter, "Agape") had a total gross income of $49,326 for the tax year 2019. Based upon this claimed total gross income for the tax year 2019, the Agape PPP Application requested a PPP loan in the amount of $10,275. The Agape PPP Application also claimed that the purpose of the PPP loan was for payroll costs, rent/mortgage interest, utilities, and covered operations expenditures. As explained below, evidence shows that Agape in fact had gross income of only $1,452 for the tax yar 2019.

32. Submitted with the Agape PPP Application was an IRS Form 1040 Schedule C, purportedly for the tax year 2019. The name of the proprietor on the Schedule C was "Stephanie D Smith" and the business name was "Agape Smith Vending LLC." The Schedule C reflected in line 7 that Agape had $49,326 in gross income and reflected in line 31 a net profit of $43,172. As explained below, evidence shows that the Schedule C submitted with the Agape PPP Application was fabricated and was not filed with IRS.

33. The Agape PPP Application was initialed and signed electronically by SMITH via DocuSign and dated April 15, 2021. Lender 2's loan file for the Agape PPP Loan showed that SMITH's identity was verified through an electronic facial similarity comparison between her Florida driver license and a photograph of herself that SMITH provided in connection with the submission of the Agape PPP Application. I have compared photograph of the person submitted with Agape PPP Application and the picture on SMITH's Florida driver license, and it appears to be the same person.

34. Subpoenaed bank records show that, on May 11, 2021, SMITH received the proceeds of the Agape PPP Loan in the amount of $10,275. More specifically, Lender 2 funded the Agape PPP loan by depositing the proceeds into a checking account ending in 1130 in the name of "Agape Smith Vending LLC" at Bank 2 via Automated Clearing House (ACH) transfer. SMITH is the sole signatory on this bank account. Based on my training and experience and understanding of the ACH system, and my review of records obtained in the Investigation, the disbursement of the Agape PPP loan caused the transmission of a wire communication in interstate commerce.

35. Subpoenaed loan records further show that SMITH applied for forgiveness of the Agape PPP Loan, and that the principal amount and interest was forgiven by the SBA. In particular, a "PPP Loan Forgiveness Application From 3508S Revised July 30, 2021" received by Lender 2 was electronically signed by SMITH via DocuSign on October 18, 2021. The forgiveness application claimed that $6,365 in loan proceeds was spent on payroll costs, and certified that the borrower (SMITH) had complied with the requirements of the PPP rules. A notice from the SBA maintained in Lender 2's records shows that the SBA made a forgiveness payment to Lender 2 for

the Agape PPP Loan's then outstanding principal balance ($10,275) and interest ($51.95) on November 1, 2021.

36. As indicated above, the Investigation obtained evidence by *ex parte* court order, federal grand jury subpoenas, and other sources, establishing that the 2019 gross income claimed in the Agape PPP Application ($49,326) was materially false, and that the IRS Form 1040 Schedule C submitted therewith was a fictitious document not filed with the IRS. In particular:

   a. SMITH's IRS From 1040 and Schedule C thereto for the tax year 2019 filed with the IRS shows that SMITH reported that, for the tax year 2019, Agape had $1,452 in gross income (Schedule C, line 7) and a net loss of -$32,239 (Schedule C, line 31). Furthermore, the version of the Schedule C submitted with the Agape PPP Application was not filed with the IRS, and the IRS had no record of any separate business tax return filed for Agape for the tax years 2019 or 2020.

   b. Bank account statements for SMITH's checking account for Agape at Bank 2 ending in 1130, which received the proceeds of the Agape PPP Loan, do not show any deposits consistent with or otherwise supporting the purported $49,326 in gross income in 2019 that was claimed on the Agape PPP Application.

   c. As part of her employment with BSO, SMITH was required to disclose to BSO any outside employment she had while employed by BSO. SMITH did not disclose to BSO that she had any outside employment related to Agape at any time.

37. Based on my training and experience, and familiarity with PPP loan applications, there is probable cause to believe that SMITH fraudulently obtained the Agape PPP loan by, among other things, falsely and fraudulently inflating Agape's gross income for the tax year 2019, and submitting a fabricated IRS tax document to support such material misrepresentations.

### *SMITH Acted Knowingly and With Intent to Defraud*
### *When She Obtained the Children 1st and the Agape PPP Loans*

38. On August 7, 2023, FBI special agents conducted a consensual interview of SMITH in Broward County. During that interview, agents showed SMITH the Children 1st PPP Application and the Agape PPP Application. In response to questions from the interviewing agents, SMITH acknowledged that: 1) SMITH had signed the respective PPP applications for Children 1st and Agape via DocuSign; and 2) SMITH had received the respective PPP loan proceeds on behalf of Children 1st and Agape. When the interviewing agents asked SMITH if the information contained in the Children 1st and Agape PPP Applications was accurate, SMITH stated that it was. At the conclusion of the interview, SMITH asked the interviewing agents whether she (SMITH) was in trouble. Based on my training and experience, and familiarity with the evidence obtained in the Investigation, I do not believe that SMITH was truthful when she told the FBI that the information in the Children 1st and Agape PPP Applications was accurate.

39. During SMITH's August 7 interview, SMITH also told the interviewing agents that she had received assistance with the Children 1st and Agape PPP Applications from a tax preparer (hereinafter, "Preparer 1"). More specifically, SMITH stated that Preparer 1 had created the IRS documents, including the Schedule C forms, that were submitted with the Children 1st and Agape PPP Applications.

40. On September 22, 2023, FBI special agents conducted a consensual interview of Preparer 1 in Broward County. During that interview, Preparer 1 stated that SMITH had told Preparer 1 the amounts to list on the Schedule C forms that were submitted with the Children 1st and Agape PPP Applications. More specifically, Preparer 1 believed that SMITH had called Preparer 1 and provided the information for the Schedule C forms over the phone. Preparer 1 believed that SMITH provided such information over the phone because Preparer 1 had made

handwritten notes on a sheet of paper recording the amounts that were included in the Schedule C forms. Preparer 1 provided this sheet with the handwritten notes to the FBI, which I have reviewed. Among other things, the sheet contains the notation "100,000 – Line 7," along with SMITH's phone number, email address, social security number, home address, among other things.

41.     Preparer 1 did not independently verify whether the information that SMITH provided to Preparer 1 was accurate. Preparer 1 stated that she has never met SMITH in person. Preparer 1 stated that she sent the completed Schedule C forms (containing the information provided by SMITH), but could not remember if she did so by email or regular mail.

42.     Preparer 1 stated that she did not prepare SMITH's 2019 actual income tax return and that she did not have a copy of such return. Based upon my review of SMITH's actual 2019 income tax return, I believe that SMITH's 2019 income tax return was prepared by someone other than Preparer 1.

## CONCLUSION

43.     Based upon the foregoing facts, your affiant submits there is probable cause to support a criminal complaint charging STEPHANIE DIANE SMITH with violations of Title 18, United States Code, Section 1343, that is, wire fraud.

**FURTHER AFFIANT SAYETH NAUGHT.**

*Kelly DiPietrantonio*
KELLY DIPIETRANTONIO
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me telephonically this 11th day of October 2023.

*Patk M Hut*
PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE

14